McNAMARA et al. v. HOME LAND & CATTLE CO.

(Circuit Court of Appeals, Seventh Circuit. January 16, 1903.)

No. 915.

1. DECREE—MATTERS CONCLUDED—DISMISSAL OF BILL FOR SPECIFIC PERFORMANCE.

A decree dismissing a bill for the specific performance of a contract for the sale of chattels, on the ground that under the facts shown a bill in equity for specific performance would not lie as matter of law, is not an adjudication of the rights of the parties under the contract.

2. CONTRACTS—CONSTRUCTION—SALE OF CATTLE.

Plaintiff contracted to sell to defendants its herd of cattle on the range, "consisting of 30,000 head more or less," and marked with plaintiff's brands, at a uniform price per head. The contract provided that at least 9,000 should be beef cattle, and that plaintiff should pay defendants $20 per head for each and every head less than that number delivered. Delivery was to be made from time to time during the season, not later than November 1st. October 22d the parties met to close up the season's deliveries, and at that time plaintiff had on hand to deliver about 450 head, none of which were beef cattle. It had previously delivered about 16,000, about 7,200 of which were beef cattle, and these constituted practically all of plaintiff's herd. Defendants claimed the right to withhold the sum of $20 per head for the shortage in beef cattle, while plaintiff demanded payment in full at the contract price for all delivered, and refused to make further deliveries otherwise. *Held*, that the contract was for the sale of the herd, and not of any specific number of cattle; that the agreement for delivery of 9,000 beef cattle required that number, irrespective of the whole number of the herd, and also contemplated that they should be a part of the herd sold; that, it being evident at the time of the final delivery that the herd did not contain such number, defendants were justified in refusing to make payment in full for the deliveries made, and were entitled, in an action against them for the contract price, to set off the damages sustained by them by reason of the shortage.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

This action was originally brought by defendant in error, a corporation organized and existing under the laws of the State of Missouri, against the plaintiffs in error, citizens and residents of the State of Montana, in the Superior Court of Cook County, Illinois, and was removed by plaintiffs in error to the Circuit Court below. The action was to recover damages for the breach of the following contract:

"This agreement, made and entered into this 27th day of May, A. D. 1897, at Chicago, County of Cook and State of Illinois, by and between the Home Land and Cattle Company, a corporation existing under the laws of the State of Missouri, by its President, Wm. F. Niedringhaus (hereafter called the party of the first part) and McNamara & Marlow of Big Sandy, Montana, (hereafter called the parties of the second part) witnesseth:

That said Party of the first part, for and in consideration of the sum of One Dollar and other valuable considerations, hereby agrees to sell to said Second Parties all of their herd of stock cattle, including steers, said herd consisting of Thirty Thousand head (30,000), more or less, now ranging upon the ranges in Valley, Dawson and Custer Counties, Montana, and being branded as follows, to wit:

'Z' on right hip.

'N–N' on left hip and side.

and any other brands owned by said First Party.

The terms and conditions of said agreement to sell, are as follows:

First. Said cattle are to be gathered by said first party and counted out to said second parties at the Stock Yards at Nashua or Oswego, Montana, on

the line of the Great Northern Railway, during the regular round-up season of 1897, no cattle to be tendered or accepted later than November 1st, 1897; all stock cattle in said herd to be accepted by said second parties whenever tendered prior to November 1st, 1897, in not less than train load lots; all steers from three years old and up, and all spayed heifers and dry cows to be delivered and counted at same points when marketable for beef, in the opinion of said parties of the second part.

Second. All calves of the season of 1897, to be delivered without count or charge to said second parties, whether branded or unbranded.

Third. No lumpy jawed cattle to be counted in deliveries.

Fourth. Should the two parties to this contract, at the close of deliveries for 1897, fail to agree upon a price at which said Second parties shall purchase the brands owned by said first party, together with all cattle bearing same, said first party agrees, during the round-up season of 1898 (prior to November 1st, 1898), to again gather all of the remainder of said herd that it can find with diligent work and deliver the same to said parties of the second part, at the same places and in the same manner and at the same price as provided for the season of 1897.

Fifth. The price to be paid by said parties of the second part for said cattle, is the sum of Twenty-Five Dollars ($25.00) per head for each and every head delivered as above provided, payable upon the delivery of said cattle.

Sixth. Said first party hereby acknowledges the receipt of the sum of Fifty Thousand ($50,000.00) as a first payment on said cattle, which sum is to be deducted, $25,000.00 from the first deliveries made under this contract, and $25,000.00 from deliveries not later than September 15th, 1897.

Seventh. Said second parties hereby bind themselves to accept and pay for said cattle at the price stated, when the same are tendered to them, under the terms of this Contract.

Eighth. Said first party hereby agrees to deposit with Messrs. Rosenbaum Bros. & Co. of Chicago, Ill., the written and acknowledged consent of this sale of all parties holding liens or mortgages of any kind against the cattle or property embraced in this Contract, upon the payment of the Fifty Thousand Dollars ($50,000.00) stated as a first payment above.

Ninth. Said first party hereby guarantees to deliver to said second parties during the season of 1897, not less than Nine Thousand head (9,000) of steers, of the ages of three years old and up, and spayed heifers of the ages of four years and up. Should they fail so to do, they hereby agree to pay to said second parties the sum of Twenty Dollars ($20.00) in cash for each and every head less than Nine Thousand (9,000) head of such cattle so delivered.

Tenth. At the end of the round-up season of 1897, the parties of the second part agree to purchase of party of the first part, Five Hundred (500) head of saddle and work horses at the price of Twenty Dollars ($20.00) per head, said horses to be selected by parties of the second part from entire herd of 700 head of party of first part, and to be serviceable and sound horses; work and saddle horses to be selected in proportion.

This Agreement is to be binding upon the heirs, successors and assigns of both the parties hereto.

Witness our Hands and Seals this 27th day of May, A. D. 1897.

       (Signed)      Home Land & Cattle Company,
                    By Wm. F. Niedringhaus,       [Seal]
                                         President.

       (Signed)       ·      McNamara & Marlow.   [Seal]

Witness:
       (Signed)      Charles Haas.
       (Signed)      Geo. W. Niedringhaus."

Plaintiffs in error pleaded non-assumpsit and set-off. One plea of set-off was for a breach of clause 9 relating to the guaranty of defendant in error to deliver, during the season of 1897, not less than nine thousand head of steers of the ages of three years and up, and spayed heifers of the ages of four years and up. Another set-off was for breach of clause four wherein defendant in error agreed, during the round-up season of 1898, prior to November 1, 1898, to gather all the remainder of the herd undelivered in 1897, that defendant in error could find with diligent work, and deliver to

plaintiffs in error at the same places and same prices as provided for the season of 1897. Another plea of set-off was upon breach of defendant in errors' undertaking that the herd consisted of "thirty thousand head more or less", the plea averring that the herd consisted, at the time, of not to exceed sixteen thousand head.

At the conclusion of the testimony, on motion of defendant in error, a verdict was entered by direction of the Court, for $36,956.30, upon which, less a remittitur of $100.00, judgment was entered. To the order of the Court on the motion to direct a verdict, an exception was preserved, and to set aside the judgment thus entered, the writ of error is prosecuted.

The further facts are stated in the opinion.

John S. Miller, for plaintiffs in error.
William Brace and F. C. Sharp, for defendant in error.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

GROSSCUP, Circuit Judge, after the foregoing statement of facts, delivered the opinion of the Court:

The contract, as a whole, contemplated a sale by the defendant in error to plaintiffs in error of its herd of stock cattle, including beef cattle, then ranging in Valley, Dawson and Custer Counties, Montana, and bearing a certain described brand. The contract mentioned the number as "thirty thousand more or less", but this was descriptive merely; the subject of barter was the herd of cattle, and, in the absence of deceit or fraud, no action would lie, merely because the number was less than the descriptive number mentioned in the contract.

The contract contained a guaranty that of this herd, at least nine thousand should be beef cattle and should be delivered during the season of 1897. The guaranty was of the highest consequence, for, though the beef cattle were much more valuable than the run of cattle in the herd, the contract price was uniform. But the guaranty was not one of ratio. It is not met and fulfilled by a tender of nine beef cattle out of every thirty of the cattle of the herd offered. It contemplated nine thousand beef cattle to be delivered during the season of 1897, irrespective of what should turn out to be the whole number of the herd, or of the beef cattle in the herd. Upon the matter of actual ratio the parties each took their chances.

In our opinion, the contract required that the nine thousand beef cattle should be a part of the herd. Manifestly, such was the mind of the parties. It was this particular herd that was in mind when the parties came to an agreement. It is probable—at least conceivable—that the herd had been looked over before the agreement, and the agreement made in view of such inspection. To allow the vendor to supply beef cattle from outside, might result in the tender of cattle inferior to those in the herd. It would result, certainly, in disturbing the actual ratio, providing the herd contained thirty thousand head of which only nine thousand were beef cattle; and it was on this basis, and this basis alone, that the parties contracted.

In this state of the contract, as we have interpreted it, the parties, near the close of 1897, (October 22, 1897) met at Oswego, Montana, to close up the transaction for the season of 1897. Already about sixteen thousand of the cattle had been shipped. Of these, including

those tendered on that day, seven thousand one hundred and thirty five were beef cattle; leaving a shortage of one thousand, eight hundred and sixty-five head under the beef cattle guaranty clause. Accepting the contract as fulfilled up to this date, there remained thus due defendant in error, including strays afterwards brought in, and the five hundred horses mentioned in the contract, $47,575.00. But if there were to be deducted $20.00 per head for the number of beef cattle undelivered, the balance would be $9,675.00. Here the parties split. The plaintiffs in error tendered the latter sum; the defendant in error stood for payment in full. Thereupon plaintiffs in error refused payment beyond the tender, filed their bill in the state court of Montana to have the contract specifically performed, and obtained the appointment of a receiver who took possession of the remaining cattle—about four hundred and fifty-seven in all. This receivership suit was subsequently removed to the United States Circuit Court for the District of Montana. The bill in the suit set forth the contract as already stated; its partial performance by both parties; its breach by the vendor, defendant in error, in refusing to deliver fully, the nine thousand head of beef cattle; and the vendor's insolvency. The answer of defendant in error denied these averments; alleged its willingness to perform; and charged that the first breach of contract was committed by the vendees, in refusing to make full payment. The suit eventuated, in the Circuit Court, in a decree ordering specific performance, as to four hundred and fifty-seven head of beef cattle, by delivering the same to the defendants in furtherance of the terms of the contract. On appeal to the Circuit Court of Appeals for the 9th Circuit (49 C. C. A. 642, 111 Fed. 822), this decree was, however, reversed, and the cause remanded with instructions to dismiss the bill.

The record in that case is now pleaded as an adjudication adverse to the defenses invoked by the plaintiffs in error, in the cause under consideration. We cannot concur in this view. Whether we look at the record of that cause, with or without the aid of the printed opinion of the Circuit Court of Appeals, we are convinced, that nothing was ever determined between the parties, save that under the facts and circumstances found by the Circuit Court, a bill in equity would not, as a matter of law, lie for the specific performance of the contract. Only under special circumstances will equity enter upon a specific performance of a contract respecting chattels, and those circumstances were absent from the cause as presented to the courts of the 9th Circuit. Indisputably, these are the grounds upon which the decree of the Circuit Court of the District of Montana was reversed, and such reversal does not, therefore, embody an adjudication of the facts of the cause.

Upon the trial of the case under consideration, in the Circuit Court for the Northern District of Illinois, plaintiffs in error offered evidence in support of their alleged set-off, tending to show that they would suffer damages. The damages claimed were measured, in the evidence offered, by the contract liquidation of $20.00 per head, and by the difference between the contract price and the value of beef cattle at the time the cattle ought, under the contract, to have been delivered. This evidence was rejected, on the theory that plaintiffs

in error, having committed the first breach, cannot set off their damages in an action to recover the contract price; the argument being that the defendant in error had until November 1st to supply the deficiency, and could, if it saw fit, have obtained such supply from outside the herd.

This was, in our judgment, an erroneous application of the law. As already indicated, it would not have been within the right of the defendant in error to supply the missing beef cattle from outside the herd. The evidence submitted tended decidedly to show, that on the date when the difference between the parties was sprung, the parties had substantially reached the end of the round-up season of 1897. It was plain then, as it has since appeared, that the beef cattle called for in the contract were not in the herd. The vendees would not, under such circumstances, be required to pay the full price, and await the expiration of the eight or ten remaining days to have verified, by mere lapse of time, what both parties knew would be the certain outcome. The view taken by the Court, considering the whole situation, was an erroneous view of the respective rights of the parties.

The Court should have admitted the evidence tendered upon this plea of set-off, as well as the evidence tendered upon the issue raised by the alleged failure of defendant in error to gather up and deliver the cattle remaining after the round-up of 1897; and for the Court's error in that respect, and in directing a verdict for the defendant in error, the judgment below must be reversed with instructions to grant a new trial.